Case number 22-6004, Jeffrey Hughes v. Zane Duncan, et al., oral argument not to exceed 15 minutes per side, Melissa Dix for the appellant, you may proceed. May it please the court, my name is Melissa Dix on behalf of the appellant, Mr. Jeffrey Hughes, counsel, and with this court's permission I've elected to reserve three minutes for rebuttal. Your honors, this case concerns the illegal incarceration of an individual by the Tennessee Board of Parole and whether the individual board members can now evade liability for their purposeful inaction by conveniently mischaracterizing the action in question or the lack thereof action. Because the district court erred by granting the defendant's motion to dismiss by finding that they were entitled to both quasi-judicial and qualified immunity for all of the following reasons, at the end of this argument, Mr. Hughes will respectfully request that this court reverse and remand for further proceedings. Beginning with absolute judicial immunity, or in this case quasi-judicial immunity, whether a quasi-judicial actor, such as a parole board member, is afforded the protection of absolute judicial immunity turns not on their identity as a parole board member, but rather we have to focus on the actual act in question. And this makes sense when we consider that the original purpose of judicial immunity is to protect judges. And the further away we get from the judiciary, the courts need to be sure that the doctrine is not being overextended to the non-judicial acts of non-judicial actors. Well, don't judges schedule hearings all of the time? Yes, your honor. So what would distinguish the parole board's actions here in essentially scheduling what is a hearing, the parole hearing, from the actions of a judge in controlling their docket and making those scheduling decisions? Yes, your honor. And that's why it's important that we zone in on what the actual action in question here is. And while the defendants and the appellees have framed that as the failure to schedule a hearing or the failure to make a parole decision, that's not the act in question. The act in question here is the appellee's failure to act in any way that is contemplated by this mandatory binary statute. So they didn't have to schedule a hearing in this case. They could have simply issued a parole certificate when the statute, which is mandatory, was triggered by Mr. Hughes' release eligibility date on September 30th. Release eligibility doesn't mean that parole is necessarily going to be granted as of a particular date, right? That's correct, your honor. I mean, what does parole eligibility get you other than the right to have the board consider whether you should be paroled as of a particular time? And that typically is done through a hearing, although I would agree it perhaps need not be. Yes, your honor. And when we're dealing with non-Reentry Success Act cases where we don't have this presumption of parole in play, I would agree that it would be the normal course of action that a hearing would be scheduled, the board would potentially hear evidence from the defendant if they have counsel, and they would make a determination. But what the Reentry Success Act has done is it has fundamentally changed how parole works for certain qualified individuals. And whether it applies to an individual is essentially a checklist for the Board of Parole to check, have they committed a D or E felony? If it's above that, are they in one of the nonviolent offenses that still affords them the presumption? Do they have any Class A or B disciplinary infractions in the last year? And those things don't require the board necessarily to conduct a hearing. If they can check off those qualifications, determine that someone is a Reentry Success Act eligible inmate, they can look at those things, say they're eligible, and they can issue a parole certificate. And that's what could have happened here. Now, what could also have happened here is what eventually happened but happened too late, which is scheduling a parole hearing, determining all of those things at the hearing, and making the determination that someone should be released. But again, when we look at the question of what the action is that's in question here, when the Reentry Success Act was triggered on Mr. Hughes' release eligibility date, the defendants had an obligation to act pursuant to a facially mandatory statute. And while they are afforded judicial immunity for things and mistakes, perhaps, that are made during the course of actions within their judicial jurisdiction, they're not afforded immunity for things that they don't have the jurisdiction or the discretion to do. And here they had two options. They could either release Mr. Hughes on parole, or they could show good cause not to. And they did not attempt to do either. Arguably, the statutory change created a presumption to be applied with the individual had a hearing set, not just automatically out of the blue. I mean, the Parole Board couldn't apply this presumption without a hearing. I mean, I guess it could have, but the ordinary procedure would be to do it in connection with a hearing, right? Your Honor, I think that while the more common series of events would, yes, be that there's a hearing, however, this statute says that upon an eligible inmate releasing their release eligibility date, there's a presumption that they shall be released. So the triggering factor in the statute is... Well, it triggers a presumption. It doesn't trigger the release immediately, doesn't it? That's correct, Your Honor. That was my point, basically. So, I mean, it seems to me that you're saying that now that the statute is in place, if they don't immediately, upon the date that they're eligible, release the individual, every time we're going to have, you know, defendants coming in here making this argument, right? I respectfully disagree, Your Honor, because what they can do and what the statute allows them to do is to demonstrate good cause, why an individual who may otherwise meet the checklist of criteria... Well, if they don't make the decision on that eligibility date, I guess that's what I'm saying. Then, yes, Your Honor. It's a mandatory statute that they have to make a decision by that date. Now, I think here, when we look at these facts, they were figuring out when that release eligibility date was quite close to... The Chancery Court litigation was taking place up to roughly one week before his release eligibility date came about. Release eligibility dates are moving targets because there are, you know, good time credits and all of those calculations that go into it, but it's not a complete mystery what an individual's release eligibility date will be. We already see under the prior parole statute that when an individual gets within a certain distance of their expected release eligibility date, they have the safety valve hearings. That's that first hearing that Mr. Hughes had as they're beginning to approach the time where parole consideration becomes appropriate. So what we will end up seeing going forward is that the parole board will need to consider when someone's release eligibility date is, and then they will need to consider do they meet at least the statutory factors, and if they do and they intend not to release them or they're not sure, then they need to demonstrate good cause or put themselves in a position to demonstrate good cause, which looks like a constitutionally compliant, due process compliant parole board hearing. So yes, they would need to do so prior to that release eligibility date, but that date is not a complete mystery. Now when we move to qualified immunity, the question is a little bit similar as far as are they acting in a judicial manner or are they acting discretionary. The qualified immunity consideration is couched in discretionary terms, and it's once again important that we look at the actual act that is in question. Now I will note that the appellees conveniently change the act that we are looking at when we shift from absolute judicial immunity to qualified immunity. Now they've shifted their argument to looking at the interpretation of a statute and their purported interpretation that this statute does not apply retroactively. Now that's problematic for a couple reasons. First, it's plainly wrong. The appellee's interpretation that this statute does not apply retroactively is frankly irrelevant to Mr. Hughes' case. The statute took effect on July 1st of 2021. His release eligibility date was September 30th of 2021, months later, and when he petitioned the board for a new hearing or for them to act in some way compliant with the Reentry Success Act, he was looking prospectively forward to the trigger date of the act which followed the act's enactment. He was not asking them to go back and look at his previous hearing. He wasn't asking them to reconsider anything that had already been heard. That's important not just for the retroactivity claim, but also because he needed a new hearing if they were going to demonstrate good cause to not release him because the prior hearing did not take place with that presumption in place. The way that parole boards evaluate an individual's circumstances changes fundamentally with that presumption in place. No one here has ever necessarily contended that the state's interpretation that this statute doesn't apply retroactively is incorrect. The statute doesn't say it applies retroactively. It's just not relevant here. Now to ascertain the bounds of the defendant's discretionary authority and to see if they were acting within it or beyond it, we have to look at the statute that provides them with the authority to do anything in the first place. When we do so, looking to the Reentry Success Act at Tennessee Code Annotated Section 4035503I, it becomes inarguable that the defendant's statutory discretion gave them two options in this situation. Upon the statute being triggered by Mr. Hughes' release eligibility date, they could either release Mr. Hughes or they could show good cause. Neither one happened here because the appellees did not attempt to satisfy either. Instead, they cited purported resource constraints and then they mentioned an inapplicable statutory interpretation and determined that was sufficient to ignore their statutory obligations. Now the Middle District of Tennessee has acknowledged, though, that the parole statute creates a fence within which the board shall exercise their discretion. So if they aren't acting within the bounds of the statute to begin with, they've stepped outside of this fence and they're acting in a non-discretionary manner. The defendant's failure to act was even more pronounced when we consider the time between September 30th, his release eligibility date, and December 27th, 2021, Mr. Hughes' actual release. By that point, on September 24th of 2021, the state had already ruled that eligible inmates are entitled to be released or good cause shown upon reaching their release eligibility date. And still, with yet another week to go until he reached that date, the appellees failed to take any action purposefully and their justification at this point is that we had a court order that said we had to have this hearing within 60 days of that order. And that's true, that order existed. However, there's one piece of helpful context that is when the court issued that September 24th order, the release eligibility date had not yet been calculated to be at September 30th. They were still operating under a December 2021 release eligibility deadline so the court would have been requiring a hearing that would still happen before that date. They also could have been in compliance with both the court order and with the Reentry Success Act. They had still a week to go and they still had time to act in compliance with that. For all of these reasons, and for the rest of the reasons included in the appellant's brief, including that the law is clearly established, the appellant would respectfully request that this court reverse the district court's order granting the appellee's motion to dismiss and remand for further proceedings. Thank you. All right. Mr. Atiyah. May it please the court, I'm Dean Atiyah with the Attorney General's Office on behalf of defendants, appellees, Judge Gibbons, Judge Davis, counsel. Your honors, I think the two questions before the court are whether the board members are entitled to absolute immunity and whether they're entitled to qualified immunity. And the district court said yes to both. But before we go into those doctrines, I do agree that it's important to specifically define the conduct at issue that's being alleged in this case. I know there's been some discussion about the conduct was not immediately releasing plaintiff on parole. But plaintiff's own complaint in this litigation involves a very specific act at a very specific time, and that was by refusing to afford Mr. Hughes a timely parole hearing in compliance with the Reentry Success Act. That's what's alleged in paragraph 39 of the complaint. The act we're talking about is the refusal of the board members to schedule a parole hearing after the Reentry Success Act passed. With regards to absolute immunity, I think this was touched upon, but that scheduling of a hearing is exactly the kind of judicial function to which absolute immunity attaches. We see in 1989 in the case of Thompson v. Duke out of the Seventh Circuit a very helpful discussion about extending immunity outside the context of just judges to other officers that act in a judicial capacity. And Thompson v. Duke likened this situation to when, for example, a criminal court judge fails to set a hearing or trial within the time allotted by the Speedy Trial Act. The court said that whether or not it was a failure or a constitutional problem, absolute immunity attaches because that judge was performing a judicial function. And then, helpfully, we've seen courts around the country, as well as this circuit, extend that judicial immunity to parole board members. The question then is, what decisions of parole board members does that judicial immunity extend to? And it is not simply the granting or denying of parole. Your Honor, I don't think that is concerning. And I would like the opportunity to clarify what they characterize as an administrative decision and what they characterize as judicial. What the parole board, the entity, argued at the Chancery Court was that no adjudicatory hearing was held for purposes of the Chancery Court's certiorari review. So it was a jurisdictional argument saying to the Chancery Court, you're allowed to review final decisions. We have not had an adjudicatory hearing. All that happened was that plaintiff's counsel appeared at an administrative hearing and we said we're not going to set a new hearing on your parole. We're going to keep it the two years out from when we last did it. So what they've called, what's being sort of bandied about as an administrative decision was really the refusal to grant his petition when he appeared at an administrative hearing. That does not change the fact that the refusal to set a hearing is still part of the judicial function. Whether they set it at that administrative hearing that was open to the public or whether they set it in a written order when he filed his petition or whether they just didn't act. It's all still a judicial function of setting hearings in the adversarial process. So I don't think this court should be concerned about the use of the term administrative hearing when it comes to deciding whether they were performing a judicial function because I do believe the case law is very clear that not just when judges but also parole board members set hearings or do not set hearings or set them too far out, that is all part of their judicial function and the cases say judicial immunity attaches to those acts. So I believe that we're still on all fours with the case law of absolute immunity in the parole board member context. With the facts of this case. Your Honor, the next question then would be does qualified immunity protect these individual board members? And again it's so important to define the right we're talking about. It's not the right to be released on parole that's alleged in the complaint. It's the right to a hearing in it's a right to a timely parole hearing in compliance with plaintiff's interpretation of the Reentry Success Act. That's the narrow right that they're alleging is clearly established. Here we have the text of the bill itself that says parole board this bill, this new Reentry Success Act applies to parole board decisions made on or after the effective date of the act. Relying on that text, the parole board said when plaintiff appeared and said Reentry Success Act I'd like a new hearing, they said we're not going to do that it'll be at your next hearing that you get that presumption the one that's already set. The Chancery Court obviously disagreed with that but the importance of the Chancery Court's decision is that that was the first time after the passage of this act with that specific language that this law had been interpreted. Cases like Armengau and Brotherton v. Cleveland say that when you have a new law subject to interpretation that has not been interpreted we can't find that it was clearly established for the violation being alleged under that law was clearly established for the purposes of overcoming qualified immunity. And it's also important to note that under the board's discretionary authority they have the discretion under 4028105B of the Tennessee Code annotated to set parole board hearings at the time, places, and manner they see fit. So they have the discretion to interpret this statute of when they're going to have a hearing and when to apply the Reentry Success Act and they had no direction from a court or the statute itself saying you have to do it immediately upon passage. And so for that reason I think the district court was correct that these board members were entitled to qualified immunity because this idea that as soon as the passage of the Reentry Success Act occurred they were entitled, the plaintiff was entitled to a parole board hearing wasn't clear to these officials. Your Honor, Judge Davis, I think it was also touched on about the administrative aspect of this decision and that in the context of absolute immunity. I think it's also important to touch on those things in the context of any preclusive effect the Chancery Court decision had. And defendants would maintain that the elements for the equitable estoppel doctrines that plaintiff is putting forth in their briefing haven't been met here for several reasons. One is that we don't have an identity, we don't have a privity here because of the Sixth Circuit precedent on differing capacities that says when you have a board or a state entity in an official capacity lawsuit and later you have an individual capacity suit those are differing capacities for the purposes of privity. And I think it also goes to the identity of interest question at the heart of privity. The argument that plaintiff is making for estoppel would effectively preclude these board members from ever using an immunity defense to protect against monetary damages. Because the Chancery Court didn't have jurisdiction to award monetary damages. It was only there to review the administrative, to do a sort of a UAPA final decision review before denying a hearing. It was not there to decide a constitutional question, it was not there to decide 1983 liability and it was not there to decide whether individual capacity liability extended and would support liability for money damages. This is the first time that the board members have been named and the first opportunity they've had to appear before a court with the power to award money damages. So effectively, this kind of offensive preclusion that's being advanced by the plaintiff would never afford these board members the absolute or qualified immunity defenses they're offering. Your Honor, if the court doesn't have any further questions I believe that's the entirety of our presentation. I'd like to begin by responding to Mr. Atiyah's argument about a new statute that's subject to new interpretation which hasn't yet been interpreted. And the argument that these board members, they were entitled to make mistakes because it wasn't clear here. And the appellant's stance on that is that it should have been clear. This court in 1984 in Mays v. Trammell interpreted a very similar board rule that created the same type of presumption that is at issue here. In that case, this court was looking at both the parole statute at the time as well as a board rule. They noted, however, that it did not take away from their interpretation of the board rule that the decisive language that the case turned on came in the form of a rule instead of a statute. And what they had there was the same type of language. This shall unless language that the Supreme Court in Greenholz has pointed out is not required but is incredibly indicative of a constitutionally protected liberty interest being established. And they had the same presumption that we have here. The long known hallmark of when a protected liberty interest can be abridged, the individual has to be afforded the protections of due process. And due process has long been held to mean to be heard in a reasonable time and in a reasonable manner. Now it's true that under the Reentry Success Act we don't yet have an interpretation of what good cause is as far as denying an eligible inmate parole. However, when we pair it with the fact that it comes with a presumption that Mays has clearly established creates this constitutionally protected liberty interest in that presumptive right to parole then there has to be at minimum a due process compliant hearing if they are going to deprive the individual of that. Because they did not do either here they have not complied with the statute and they have not complied as the Chancery Court pointed out with any of the principles of due process. I would also like to point out briefly from their brief that they note that the clearly established law must be particularized to the facts of the case. The facts of Mays are not identical but they are quite similar. There the individual was afforded a hearing but they were not allowed to present any evidence and the court there still found that that was a violation of due process because that hearing was not up to snuff with due process. Mr. Hughes was not afforded even a non- due process compliant hearing. He was afforded no hearing whatsoever and simply deprived of his constitutionally protected liberty interest with no due process. For all of the reasons stated and all of the reasons in our briefing the appellant respectfully requests that this court reverse. Thank you. Thank you both for your argument. We will consider the case carefully.